### IN THE MATTER OF FREDERICK PETRY, Jr.

Argued November 26, 1917—Decided December 6, 1917.

On rule to show cause why the removal of an employe in the state
comptroller's office should not be set aside pursuant to *Pamph.
L.* 1915, *p.* 209, evidence *held* to show that the comptroller re-
moved the employe, not for political reasons, but in good faith
and for just cause, among other matters for habitual disregard
of the hours of employment.

On petition and rule to show cause why the removal of
Frederick Petry, Jr., from the position of employe in the state
comptroller's office should not be aside pursuant to the powers
conferred by chapter 120 of *Pamph. L.* 1915, *p.* 209.

Before Justice TRENCHARD.

For the rule, *Linton Satterthwaite.*

*Contra, Francis H. McGee* and *John W. Wescott,* attorney-
general.

The opinion of the court was delivered by

TRENCHARD, J. The evidence upon which I am to pass
judgment is that taken before the civil service commission,
and was, by agreement, submitted to me November 26th,
1917.

In my opinion it does not justify any interference with the
removal of Mr. Petry. No complaint is made of the method
of procedure. The sole complaint is that the removal was in
violation of section 24 of the Civil Service act (*Pamph. L.*
1908, *p.* 250, *ch.* 156) in that it was for political reasons.
But the evidence does not substantiate that complaint. On
the contrary it shows that the removal was for a just cause.

There is no evidence that Mr. Edwards, the state comp-

troller, removed Mr. Petry because he was affiliated with one political party and the comptroller with another. The evidence is all to the contrary, and in this connection it is significant that the record shows that, apart from the present case, no member of the office force was displaced by Mr. Edwards during his incumbency of the office except by transfers or resignations.

Mr. Petry's real contention is that he was removed because he displeased Mr. Edwards by giving testimony (as he was required to do) before a legislative investigating committee.

Of course, if I found such to be the fact, I would not hesitate to reinstate him. But I do not find such to be the fact. Mr. Edwards denies it, and says that the cause was that stated in the notice to Mr. Petry, i. e., a persistent and continual disregard of the hours of employment fixed by the comptroller's written order of September 29th, 1914, and an attitude antagonistic to his superiors in office, all tending to impair department discipline.

I am constrained to think that the admissions of Mr. Petry, taken in connection with the other evidence, clearly substantiates Mr. Edward's claim.

When Mr. Edwards took office he found Mr. Petry there in the collateral inheritance tax department of the office.

Mr. Petry says the office hours (excepting Saturdays) were from 9 A. M. to 4 P. M., with reasonable time for lunch.

Mr. Edwards and others say they were from 9 A. M. to 5 P. M.

I have not stopped to ascertain who was correct about that because, as hereinafter pointed out, it is not material to the determination of the present controversy.

It appears that Mr. Petry, while thus employed by the state, and years before Mr. Edwards took office, had established an outside business of his own (an express business) having no connection with his state employment.

He says that there was no objection to this upon the part either of Mr. Edwards or of his predecessors in office. No doubt this was true.

*91 N. J. L.*                    In re Petry.

Mr. Edwards says he knew of Mr. Petry's outside business connection and had no objection to it so long as it did not interfere with his service to the state.

Mr. Petry says that his outside business rendered it impossible for him to reach the comptroller's office at 9 o'clock. He frankly admits that he never reached the office on time, but habitually came in from 9:15 to 9:25. Others say he sometimes came in later.

He says that this was known by Mr. Edwards and his predecessors in office, and was with their permission or acquiescence.

Mr. Edwards denies this so far as he was concerned.

But this conflict of testimony becomes unimportant because, if for a time Mr. Edwards acquiesced, there came a time when he demanded punctuality upon Mr. Petry's part, of which the latter had ample notice. Thus, it appears that, after a time, complaint of Mr. Petry's persistent and continual want of punctuality reached Mr. Edwards. No doubt this, and the fact that the business of the office had increased to such an extent as to demand full time, and indeed to require overtime from many of the force, induced Mr. Edwards to give Mr. Petry and other office employes a written notice that the hours of employment in certain departments, including Mr. Petry's, "shall be as follows: Weekdays 9 A. M. to 5 P. M., Saturdays 9 A. M. to 12 M."

Mr. Doughten, the deputy comptroller, testified that when Mr. Petry received that notice "he brought the letter to me a day or two after it was issued, and threw it down and asked if I received it, and I told him I had. He said what are you going to do about it. I said I am going to obey it; the comptroller has been in office three years, and had fixed these office hours, and if anyone does not like them he will have to leave—that is all."

Mr. Petry admits that he knew the notice applied to him, and that he gave no heed to it, but continued his practice of always coming in late. It is, therefore, unimportant that the comptroller reported to the civil service commission all his employes perfect as to punctuality for the years *1912 and 1913*, especially in view of his accompanying letter saying

that all were considered perfect who were fit to be retained. I think that the comptroller's notion as to the proper method of marking was erroneous, but that is not now material. The important fact in this connection is that such was in fact the view of the comptroller. It is significant that there was no such report made after the notice fixing office hours was promulgated September 29th, 1914.

The order fixing office hours by its terms provided that exceptions to the hours might be made by special arrangements with the heads of departments in certain stated circumstances. But Mr. Petry was not of the class permitting of the exception as I read the record. But, however that may be, Mr. Petry admits that no such exception was made in his case. Indeed he did not seek to have an exception made in his favor.

Thereafter the comptroller was advised by Mr. Petry's immediate superior of Mr. Petry's continued failure to comply with the order respecting office hours and the comptroller called the attention of Mr. Doughten, his deputy, to the fact. Mr. Doughten says that he repeatedly, both personally and through others, warned Mr. Petry, but still he continued to come in late.

I am asked to discredit the testimony of Mr. Doughten with respect to these warnings. But why should I do so? The records show him to have been a sincere friend of Mr. Petry. He was instrumental in getting him an increase in salary along with others. He interceded with the comptroller in his behalf and thereby delayed his removal from time to time. Moreover, with respect to most of the important parts of Mr. Doughten's testimony, Mr. Petry, in effect, admits it to be true.

On November 12th, 1915, Mr. Doughten, acting comptroller, by direction of his chief, notified Mr. Petry that his services would not be required *after November 20th,* for causes which were stated; among others, failure to comply with the hours of employment as fixed by the order of September 29th, 1914, and informed him that he should answer the charges within a reasonable time.

As an illustration of Mr. Petry's attitude towards the comptroller's order respecting office hours it appears that even after the receipt of the notice that his services would not be required *after November 20th,* and requiring answer to the charge of want of punctuality, he still continued to come in late.

Mr. Petry claims that at least he observed the hours "in spirit" by working after hours. This is in dispute, there being much testimony to the effect that he usually left at or near five o'clock. But whether so or not is immaterial because the comptroller had a right, and indeed it was his duty, to fix the time when his employes should begin work. This he did, and he should have been obeyed. The persistent and continued refusal of Mr. Petry to observe hours naturally attracted the attention of other employes, who frequently made remarks about it, all of which tended to embarrass the heads of departments and to break down the discipline of the office. This was all the more embarrassing because at this very time the work of the office had so increased that many of the office force voluntarily worked overtime, some of them often late into the night. To say now that the removal of Mr. Petry in these circumstances was unlawful would be to say in effect that the comptroller could not lawfully fix and enforce reasonable hours of employment in his office, and this I cannot do.

It will be seen, of course, that this case does not raise the question of the propriety of the removal of an employe because occasionally late, with or without a proper excuse. With respect to such a case I am not required to express an opinion. The present is a case of the removal of one who was always late in the face of notice requiring punctuality and after repeated warnings.

It is contended that the real cause of Mr. Petry's removal was the testimony he gave before the legislative committee, and that the cause assigned was a mere pretext. I do not so find. True the comptroller complained bitterly that such testimony was so phrased as to misrepresent his office. He

says that it confirmed his prior conviction as to Mr. Petry's antagonistic attitude. But he denies that Mr. Petry's testimony before the committee was the cause of his discharge. The question whether the comptroller's complaint respecting that testimony was just I am unable to determine for the reason that there is not sufficient of it before me to enable me to judge. I must say, however, that such parts of it as are before me would not justify his removal. No doubt at the time the comptroller was irritated by reports made to him concerning Mr. Petry, some of which, if true, furnished just cause for complaint. Apart from what is said to have been his disposition to improperly ignore his immediate superior in his department, there was the letter which Mr. Petry admits he wrote for the Petry Express Co. in July, 1914, to Oliver A. Quayle, Sr., in the endeavor to collect a bill due the company. Therein he stated "Our Mr. Petry, who is *connected with the Comptroller's office* of the treasury department, is given to understand that if this matter was presented to you personally that you would see that we would get a prompt settlement. Anything that you can do for us in this connection will *save trouble here at Trenton* and will also be greatly appreciated by us." This letter was particularly offensive to the comptroller because at the time claims of the Quayle company against the state were pending in his office.

It is argued that such letter could not have seriously offended the comptroller because he did not at once dismiss Mr. Petry upon hearing of it. But the record shows that for a long time the comptroller did not know that Mr. Petry *personally* wrote the letter. It appears that when Mr. Doughten was first shown what purported to be a copy of the letter he said: "That was probably signed by someone down at the express office. I do not think that Petry would do that." It also appears that definite and certain knowledge that Mr. Petry *personally* wrote the letter did not come to the comptroller until about the time when he ordered his dismissal. Now it may be that Mr. Petry considered that he was justified in writing the letter in the circumstances. But I think he

was not. I think the comptroller was naturally offended and was quite justified in regarding it as likely to bring his office into disrepute.

Upon the whole the evidence shows that the comptroller removed Mr. Petry for just cause and in good faith and not for political reasons.

The rule to show cause will be discharged and the petition dismissed.